WABASH RAILWAY CO. *v.* MARSHALL.

1. EXECUTION—AMENDMENTS.

Where an execution in aid of judgment incorrectly ran against the "Wabash Railway Co.," instead of the "Wabash Railroad Co.," but it correctly described the judgment, it is within the power of the Supreme Court to amend the execution in said court and save the decree.

2. EQUITY—POWER TO RELIEVE AGAINST FRAUD.

A court of equity has power to relieve against fraud, even to the extent of setting aside its own decrees when founded thereon.

3. RAILROADS — EQUITY WILL ENFORCE EXECUTION AGAINST RE-ORGANIZED CORPORATION FOR DEBT OF PREDECESSOR.

Where, in the reorganization of a railroad company, assets worth over $205,000,000 were taken over by the new company for considerably less than $100,000,000, without satisfying the claim of a judgment creditor, who was not a party to the reorganization plan, who never received notice thereof, and who never consented thereto, equity has power to afford him relief from the fraud so perpetrated by enforcing execution of his judgment against said property.

4. SAME—FRAUDULENT INTENT NOT NECESSARY.

That there was no moral turpitude involved on the part of any one, in said reorganization, makes the transaction none the less a fraud upon said creditor's rights.

5. SAME—EQUITY—OFFER OF UNAUTHORIZED STOCK NOT A LEGAL TENDER.

Where the stock of the reorganized company had not been approved by the railroad commission as required by 2 Comp. Laws 1915, § 8161, and if issued its issue would be in the face of a penal statute (sections 8162, 8163), and it was of little market value, a tender of said stock at par to satisfy a judgment creditor's claim was not an offer to do equity so as to discharge the judgment.

On right to bring action against corporation or prosecute pending action as affected by the appointment of a receiver for corporation, see note in 8 A. L. R. 441.

As to payment for stock by transfer of property as protection against liability to creditors of corporation, see note in 42 L. R. A. 593.

224—Mich.—38.

6. COURTS—PARTY COMMENCING SUIT IN STATE COURT MAY NOT COMPLAIN BECAUSE NOT BROUGHT IN FEDERAL COURT.

Where the reorganized company filed a bill in the State court to restrain a judgment creditor from enforcing execution against its property, and he filed a cross-bill for relief, it may not complain because the proceeding was not brought in the Federal court.

7. CREDITORS' SUIT—UNSECURED CREDITOR MAY MAINTAIN SUIT IN AID OF EXECUTION.

Where it was anticipated that in the reorganization of a railroad company certain of the unsecured creditors would not accept the plan provided, and certain stock and bonds were placed in a trust fund for meeting such claims, and it does not appear that said fund has been exhausted or that there is not enough to pay every such claim in full, an independent suit to satisfy a judgment may be maintained in the nature of a creditor's bill.

SHARPE and MOORE, JJ., dissenting in part.

Appeal from Lenawee; Hart (Burton L.) J. Submitted June 20, 1923. (Docket No. 47.) Decided October 1, 1923. Rehearing denied December 20, 1923.

Bill by the Wabash Railway Company against Lewis J. Marshall and another to restrain a sale under an execution. Defendant Marshall filed a cross-bill to enforce the collection of a judgment. From a decree for defendant Marshall, plaintiff appeals. Modified and affirmed.

*Baldwin & Alexander,* for plaintiff.

*F. M. Sala* and *J. N. Sampson,* for defendant Marshall.

STEERE, J. Defendant Marshall received serious injuries while a passenger on a train of the Wabash Railroad Company February 2, 1908. Two judgments in his favor were reversed by this court (*Marshall* v. *Railroad Co.,* 163 Mich. 88, 171 Mich. 180). A judgment in his favor for $11,255.75 was affirmed March 18, 1915 (*Marshall* v. *Railroad*

*Co.,* 184 Mich. 593). An unsuccessful attempt was made to collect this judgment (*Marshall* v. *Railway Co.,* 201 Mich. 167). The Wabash Railroad Company operated an extensive system extending through several States. December 18, 1911, the Westinghouse Air Brake Company, a general creditor, filed its bill in the circuit court for the eastern district of Missouri, eastern division, for the appointment of a receiver for the railroad company. Like bills were filed in the jurisdictions traversed by the railroad, including the eastern district of Michigan, the Missouri court, however, being the court of primary jurisdiction. In each instance the railroad company voluntarily appeared and consented to the appointment of receivers. On January 26, 1912, the Equitable Trust Company of New York, then trustee in the mortgage given to secure the payment of the so-called first refunding and extensions mortgage bonds, filed its bill for the foreclosure of the mortgage and the appointment of receivers of the railroad company in the Missouri court, and like bills were filed in the other jurisdictions traversed by the railroad. In each instance the railroad company voluntarily appeared and consented to the appointment of receivers, and the same receivers were appointed as in the Westinghouse case. Later the two suits were consolidated. From the fact that certain deposit agreements (not appearing in the record) were entered into December 18th, and December 20, 1911, and the further fact that the appointment of receivers and other proceedings were by consent, it is patent that these proceedings were prearranged.

We have been unable to check all the figures giving the capitalization of the company at the time of the appointment of the receivers. Some are given in the oral testimony and some in the exhibits. While the figures approximate, they do not in every instance

exactly agree, and we have concluded to accept, for the purpose of the opinion, those given in the plan of reorganization, as these were the figures upon which the parties acted.    From this plan it appears that the underlying bonds amounted to $63,615,000 (some of these were unexchanged debenture mortgage bonds) ; the equipment obligations to $3,120,000; old equipment obligations merged in the decree in the Compton case $950,377; first refunding and extensions mortgage bonds $40,600,000; preferred stock $39,200,000; and common stock $53,200,000.    The receivership proceedings seemed to progress smoothly, all orders being entered by consent.    It should be here stated that no notice of the proceedings was given, either by publication or in any other manner to the unsecured creditors, and while committees represented the various bondholders and stockholders no committee represented the unsecured creditors and they do not appear to have participated in any way in the proceedings.    Defendant Marshall was not brought into them in any way and never appeared or participated in them.

On April 28, 1915, the bondholders' committee, the stockholders' committee, and the joint reorganization committee prepared a plan of reorganization which, with the accompanying agreement, covers some 69 pages of the record.    It contains much detail unnecessary to relate, but its predominating provisions contemplated the continued ownership of the property by the old stockholders, a substitute of the stock in the amount of 120 per cent. for the first refunding and extensions mortgage bonds, and incidentally a provision for assenting unsecured creditors.    The provision for unsecured creditors will be presently considered.    The plan provided for raising money to pay off receivership certificates then amounting, with interest, to upwards of $16,000,000 and the payment of

expenses of the receivership and the reorganization and for further working capital.   The underlying bonds and equipment obligations were to remain undisturbed, a new company was to be organized with common stock, preferred stock "A," and preferred stock "B."   The owners of preferred stock in the old company were to receive 50 per cent. of their holdings in preferred stock "A" and 50 per cent. in common stock in the new company.   The owners of common stock in the old company were to receive $26,600,000 in preferred stock "A" and $23,940,000 common stock in the new company.   The stockholders were required to pay an assessment of $30 per share, and upon their failure to pay such assessment the owners of the first refunding and extensions mortgage bonds were to do so and take the new stock.   To effectuate the plan and agreement a decree for the sale of the property was entered by consent and the property was sold to a purchasing committee.   A new company under the name of the Wabash Railway Company was organized under the laws of the State of Indiana, and the property was deeded by the master and others to such new company.   From the verified articles of incorporation filed with the secretary of State it appears that the property was then worth $205,118,000.

On March 26, 1920, an execution was issued on the Marshall judgment.   Either through the inadvertence of the clerk or the attorney this execution ran against the Wabash Rail*way* Company, but it correctly described the Marshall judgment.   Under it defendant Nutten, sheriff of Lenawee county, levied on certain real estate located in the city of Adrian and advertised the same for sale.   Thereupon this bill was filed to restrain the sale and to remove the levy as a cloud on plaintiff's title.   Defendant Marshall answered and later, by way of amendment, claimed the benefit of a cross-bill.   We are persuaded that the case must

be disposed of on defendant's cross-bill, as it is manifest that unless defendant Marshall is entitled to the relief he prays the plaintiff must prevail.

1. It was within the power of the court to amend the execution so that it would run against the Wabash Railroad Company instead of the Wabash Railway Company (*In re Davis*, 218 Mich. 220). And this court may here make such amendment to save the decree (*Peacock* v. *Railroad Co.*, 208 Mich. 403 [8 A. L. R. 964]; *Youngs* v. *Advance-Rumely Thresher Co.*, 215 Mich. 682). Such an order will be here entered.

2. The affirmative relief prayed in the amended answer was in the nature of that of a creditor's bill and in aid of execution. A court of equity is not without power to afford relief from fraud even though that fraud is perpetrated through the instrumentality of a decree of a court. In *Raniak* v. *Pokorney*, 198 Mich. 567, which was an independent suit in equity to afford relief from a decree fraudulently obtained, this court said:

"There can be no doubt of the authority of a court of equity to relieve against fraud, even to the extent of setting aside its own decrees when founded thereon."

In the instant case it must be remembered defendant Marshall had no notice by publication or otherwise of the receivership proceedings. He was not made a party to it as he might have been had the parties desired to bind him by the decree. By these proceedings, which were pre-arranged and all of which were consented to by the railroad company, judgment debtor of Marshall, the new company acquired property which its president swore was worth $205,118,000 and which valuation is fairly sustained by some of the proofs, and for which it paid only the amount required to pay the receivers' certificates and certain expenses, leaving the underlying bonds and equipment obligations standing, or a total amount of considerably less than

$100,000,000. In other words, it received through these proceedings property worth over $205,000,000 for considerably less than $100,000,000 without satisfying defendant Marshall's judgment or without offering to do him equity as we shall presently see, and the stockholders of the old company were, upon paying their assessment necessary to effectuate the plan, continued as stockholders in the new company. It is not necessary to find moral turpitude on the part of anyone. The statement of the transaction and its results demonstrates that a fraud was in fact perpetrated on defendant Marshall. The instant case is on all fours with and controlled by *Northern Pacific R. Co.* v. *Boyd,* 228 U. S. 482 (33 Sup. Ct. 554). It was there said by Mr. Justice Lamar, speaking for the majority of the court:

"Corporations, insolvent or financially embarrassed, often find it necessary to scale their debts and readjust stock issues with an agreement to conduct the same business with the same property under a reorganization. This may be done in pursuance of a private contract between bondholders and stockholders. And though the corporate property is thereby transferred to a new company, having the same shareholders, the transaction would be binding between the parties. But, of course, such a transfer by stockholders from themselves to themselves cannot defeat the claim of a non-assenting creditor. As against him the sale is void in equity, regardless of the motive with which it was made. For if such contract reorganization was consummated in good faith and in ignorance of the existence of the creditor, yet when he appeared and established his debt the subordinate interest of the old stockholders would still be subject to his claim in the hands of the reorganized company. . Cf. *San Francisco, etc., R. Co.* v. *Bee,* 48 Cal. 398; *Grenell* v. *Detroit Gas Co.,* 112 Mich. 70. There is no difference in principle if the contract of reorganization, instead of being effectuated by private sale, is consummated by a master's deed under a consent decree. * * * For, if purposely

or unintentionally a single creditor was not paid, or provided for in the reorganization, he could assert his superior rights against the subordinate interests of the old stockholders in the property transferred to the new company. They were in the position of insolvent debtors who could not reserve an interest as against creditors. Their original contribution to the capital stock was subject to the payment of debts. The property was a trust fund charged primarily with the payment of corporate liabilities. Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor was invalid. Being bound for the debts, the purchase of their property, by their new company, for their benefit, put the stockholders in the position of a mortgagor buying at his own sale. If they did so in good faith and in ignorance of Boyd's claim, they were none the less bound to recognize his superior right in the property, when years later his contingent claim was liquidated and established."

That the *Boyd Case* is controlling here is made patent by a perusal of the dissenting opinion written by Mr. Justice Lurton in which many of the same arguments are advanced as are here advanced by plaintiff's counsel. It is also there pointed out and emphasized that as here the proceedings were not adversary proceedings with all questions actually litigated in court but what was done was done by consent, the consent evidently being given to effectuate the purpose of keeping the property for the old stockholders. It will be noted that the prevailing opinion in the *Boyd Case* cites and relies on our own case of *Grenell* v. *Detroit Gas Co.*, 112 Mich. 70. In that case the transfer of the assets of the Michigan Gas Company to the Detroit Gas Company was by an exchange of the stock in the old company for that of the new. The complainant Grenell had recovered a judgment against the old company after such transfer in a suit brought before the dissolution of the old company. It was sought in that case to subject the assets

in the hands of the new company to the payment of the judgment against the old one.    The bill was sustained and it was there said:

"Again, a corporation cannot sell all of its property, and take in payment stock in a new corporation, under an arrangement that has the effect of distributing the assets of the vendor among its stockholders, to the exclusion and prejudice of its creditors; and a company making such a purchase, in consideration of an issue of its own stock to such stockholders, takes the property subject to the rights of creditors.    Such an arrangement is a diversion of the trust fund.

"It is said that there is nothing to show an intention to defeat the creditors of the Michigan Gas Company, as this was not a liquidated claim at the time this transfer was made.    See *Schaible* v. *Ardner*, 98 Mich. 70.    Under the arrangement, the promoters and stockholders of the Detroit Gas Company knew that it was getting all of the property of the Michigan Gas Company, without provision for its debts, if there were any.    It was bound to know that this property was charged with such debts, and ought not to be distributed among the stockholders to the exclusion of creditors.    It was a party, then, to a diversion of the trust fund, and, having in its possession such fund, holds it subject to the payment of debts.    It cannot be called a *bona fide* purchaser of the property, as against existing creditors."

See, also, *Louisville Trust Co.* v. *Railway Co.*, 174 U. S. 674 (19 Sup. Ct. 827); *Kansas City Southern R. Co.* v. *Guardian Trust Co.*, 240 U. S. 166 (36 Sup. Ct. 334).

3. Generally speaking, upon the dissolution of a corporation, its assets are applicable, *first*, to the payment of secured debts; *second*, to the payment of unsecured debts; *third*, the balance, if any, to be distributed among its stockholders.    But in the case of large corporations with vast properties like the Wabash the impossibility of literally following this order of distribution has frequently been demonstrated.    Cash customers can not be found for such

properties.   New companies must be formed to take them over.   Fresh money must be put into them. Bondholders, stockholders and general creditors must alike yield to the law of necessity if the properties are saved to discharge their functions.   The courts have recognized this situation and it may be regarded as the settled law, enunciated frequently by courts having such problems to meet, that upon the reorganization of such properties, if the unsecured creditors are equitably and fairly dealt with, if they are given an equitable interest in or lien on such properties, they can not be heard to complain.   It is the claim of the plaintiff that there was offered by mail to defendant Marshall and his attorneys in payment of the judgment 25 per cent. in preferred stock "B" in the new company and 75 per cent. in common stock.   The receipt of such offer is denied by both defendant and his attorney.   Under the view we take of the case we may assume that both claims are true.   The stock offered had never been authorized or approved by the Michigan railroad commission as required by section 8161, 2 Comp. Laws 1915.   If issued, its issue would be in the face of a penal statute (2 Comp. Laws 1915, §§ 8162, 8163).   We are not persuaded that such tender of unauthorized stock was good (*Seamans* v. *Temple Co.*, 105 Mich. 400 [28 L. R. A. 430, 55 Am. St. Rep. 457]; *Edward* v. *Ioor*, 205 Mich. 617 [15 A. L. R. 256]).   While the stock had been listed on the New York stock exchange it was not a seasoned stock, was of little market value, and if there sold would have brought defendant less than 20 per cent. of his judgment, and he would have received less in money than the amount of costs taxed against him in court with interest in his unsuccessful efforts to secure and collect his claim.   In view of the exceedingly valuable equity plaintiff and its stockholders acquired by these proceedings, we are persuaded the offer was not an

equitable or fair one to the unsecured creditors.    We, therefore, hold both as matter of law and fact that this offer was not an offer to do equity so as to discharge the judgment.    Nor was defendant Marshall bound by the decree or estopped from here asserting his claim by reason of unfruitful discussion of settlement between his former attorney and the officers of plaintiff.

4. It is further insisted by plaintiff's counsel that defendant Marshall has not sought the proper forum; that the Federal court retained jurisdiction and that defendant Marshall should have proceeded there; and *Julian* v. *Central Trust Co.*, 193 U. S. 93 (24 Sup. Ct. 399), *Wabash R. Co.* v. *Adelbert College*, 208 U. S. 38 (28 Sup. Ct. 182), and kindred cases are relied upon.    We think the instant case is clearly distinguishable from the cases relied upon.    In the first place plaintiff itself selected the forum, it invoked the aid and jurisdiction of the State court. It brought defendants into the State court there to litigate their differences.    Having invoked the jurisdiction of the State court, it can not be heard to complain if defendant there asserts his defense. But beyond this view we are not persuaded, after taking everything into consideration, that it was contemplated by the parties that only by proceedings in the Federal court could the rights of non-assenting general creditors be taken care of.    This necessitates that we state a little more fully the provisions for unsecured creditors.    The plan of reorganization contained the following provisions:

"In addition to the foregoing securities there will be issued such additional amounts of stock (now impracticable to be accurately stated, but in no event expected to exceed $5,000,000 par value thereof in the aggregate) as may be required for the sole purpose of making provisions, as hereinafter provided, for holders of unsecured claims against the Wabash Rail-

road Company as the same shall from time to time be ascertained.     *     *     *

"Unsecured creditors of the Wabash Railroad Company will be entitled under the plan to receive, in settlement and discharge of their claims duly presented and established, 25 per cent. thereof in convertible preferred stock 'B,' at par and 75 per cent. in common stock, at par, of the new company.     *     *     *

"Holders of general unsecured indebtedness of the Wabash Railroad Company desiring to participate in the plan and agreement of reorganization must do so on the terms therein provided and in the manner hereafter to be announced by the joint reorganization committee."

The agreement accompanying the plan of reorganization stated:

"Holders of general unsecured indebtedness of the railroad company desiring to participate in the plan and this agreement must do so upon the following terms and conditions"—

followed by provisions for the filing and hearing of claims of such participating or assenting unsecured creditors.     These provisions contemplated hearings in court upon the claims of such creditors as assented to the plan and accepted the provisions therein made. But that it was understood that some of the unsecured creditors would not accept the plan and would have to be taken care of in some other way than there provided for is patent from one of the provisions of plaintiff's charter.     We quote it:

"This corporation shall have the power to assume any debts and liabilities of said The Wabash Railroad Company and to make such adjustment and settlement with any stockholder or stockholders or creditor or creditors, of said company as may be deemed expedient, and, for such purpose, to use such portions of the bonds and stock of this corporation as may be deemed advisable, and in such manner as this corporation may deem proper."

This provision gave the new company a trust fund

applicable to the payment of the debts of unsecured creditors of the old company, who had not participated in or accepted the plan.    The evidence does not disclose that either the $5,000,000 of stock mentioned in the plan or the other available funds mentioned in the charter have been exhausted.    And, so far as the record discloses, the new company has in such trust fund sufficient to pay every unsecured creditor one hundred cents on the dollar.    Under such circumstances we are persuaded that an independent suit may be maintained in the nature of a creditor's bill.    The *Boyd Case, supra*, was an independent suit of such character and was sustained.

It follows that the decree of the court below must be affirmed with such modifications as this opinion necessitates.    Defendant will recover costs of this court.

WIEST, C. J., and FELLOWS, McDONALD, and CLARK, JJ., concurred with STEERE, J.

SHARPE, J.    I concur except as to this sentence, "If issued, its issue would be in the face of a penal statute (2 Comp. Laws 1915, §§ 8162, 8163)."

MOORE, J., concurred with SHARPE, J.    BIRD, J., did not sit.